EIS *v.* CROZE.

1. RELIGIOUS SOCIETIES—FUNDS—OWNERSHIP.

Moneys accumulated by a voluntary unincorporated club com-
posed of parishioners of a Roman Catholic church, not ac-
cumulated for general church purposes, but obtained either
for the specific purpose of building a new church, or such
other specific church purpose as the membership of the club
should determine upon, do not belong to the bishop of the
diocese, nor to the church, nor are they subject to their con-
trol.

2. SAME—TRUST PROPERTY—DECLARATION—RIGHTS.

A voluntary committee of men parishioners of a Roman Cath-
olic church purchased a parcel of land for the purpose of
providing a site for a new church building and took the title
in the name of one of themselves, who executed a declaration
of trust providing for the transfer of the property to the
bishop of the diocese on payment by or for the church within
three years of the money advanced. A club of the women
parishioners contributed funds not belonging to or under the
control of the church or of the bishop on the agreement that
they were to have a half interest in the property, subject to
the terms of the declaration of trust. The church declined
the offer of a site and built elsewhere. *Held*, that the bishop
could predicate no rights to the men's half interest in the
property on the action of the women's club.

3. EVIDENCE — PAROL EVIDENCE — VARYING WRITING — COMPE-
TENCY.

On a bill by the Roman Catholic bishop of a diocese to enforce
specific performance of a declaration of trust in certain real
estate, a part of the funds for which were contributed by a
voluntary club of the parishioners of the parish, parol evi-
dence that the property was purchased by the trustee and
others for the purpose of providing a site for a new church
building is competent for the purpose of determining the
legal effect of the action of the club.

Appeal from Houghton; Streeter, J. Submitted June
4, 1907. (Docket No. 4.) Decided July 1, 1907.

Bill by Frederic Eis, Roman Catholic bishop of the

diocese of Sault Ste. Marie and Marquette, against Joseph Croze and others to enforce the specific performance of a declaration of trust. From a decree for complainant, defendant Croze appeals. Reversed, and bill dismissed.

*Lewis N. Legris*, for complainant.

*Chadbourne & Rees*, for appellant.

BLAIR, J. Complainant filed the bill of complaint herein to enforce the specific performance of a declaration of trust executed by the defendant Croze on the 4th day of April, 1893. The instrument declaring the trust, after reciting the purchase of certain real estate subject to certain liens and payment therefor with the proceeds of a note signed by Croze and indorsed by the other defendants, contains, among other provisions, the following:

"Now I, the subscriber, do hereby declare and make known that the said property is held by me in trust for the following uses and purposes, and with the following powers vested in me as such trustee and by virtue of this instrument expressly reserved to myself, namely:

"*First.* The property above described shall be held in trust as security for the payment of the said note discounted as aforesaid, and the interest thereon, or for the payment to the subscriber and the said indorsers of any sum or sums which they or any of them shall pay by reason of the said note, or by reason of the making and indorsement of the same, or of any renewal or renewals of the same or any part thereof, and of any sum or sums which they or any of them shall pay as interest on the same, and of any sum which they or any of them shall pay for the purpose of perfecting title to said property or for removing the liens therefrom, and until said sums and said note shall have been fully paid.

"*Second.* Upon the full payment of the several sums mentioned in the foregoing paragraph by or on behalf of the St. Ignatius Church Society of Houghton, Mich., within the period hereinafter mentioned, but not thereafter, except at the option of said trustee and said indorsers, the said property is to be conveyed by the said trustee to the Right Reverend Bishop Vertin, or his successor, for the use of the said church society.

"*Third*. After the expiration of three (3) years from the date of this declaration of trust, if within that time the said church society shall not have fully paid said amounts as mentioned in paragraph first, then the said trustee shall have, and hereby reserves and retains, the power and right, with the consent or request of a majority of said indorsers, including himself, to sell said property and to convey the same to such person or persons, and upon such terms as they shall deem proper. The proceeds of such sale to be applied as follows:"

This instrument was duly recorded, but was not delivered, being retained by defendant Croze. The circumstances leading up to the purchase of the property and the execution of the declaration of trust were, briefly, as follows: The society was contemplating the erection of a new church edifice, but the parishioners were not agreed as to the location of the new building. Father Manning, the then parish priest, the defendants, and others, were in favor of locating the building on the property in question. Others, and, as it afterwards developed, a majority, were in favor of locating the new building upon or near the old site. The defendants, for the purpose of procuring the location of the church upon the new or downtown site, organized themselves into a voluntary and unofficial committee, purchased the land in question, and caused the conveyance thereof to be made to the defendant Croze.

"The committee of men belonging to St. Ignatius congregation were anxious to have the church built on the main street, and that property was purchased for that purpose. * * * It was with the end in view of getting this property for the new church. The indorsers on the note at the time were Mr. Croze, with the parties that were representing the crowd that wanted a church down town."

The original loan was $2,389.92, increased in May, 1894, to $3,030.46. The principal source of revenue of the committee was the rent from the property. May 2, 1894, the committee borrowed $1,000 of the lessee of the property, for the purpose of making repairs, upon the note of Joseph Croze, trustee, indorsed by others of defendants.

This note was paid in rent, and, until paid, the revenue from rents ceased. In the summer of 1894, the committee applied to an association of ladies of the church for assistance. These ladies were associated under the name of the "No Name Club" at one time; of the "Harmony Club" at another time. The nature of the association, its relation to the church, to the men's committee, and to the property in question, are stated by Mrs. Edwards, a member of the association, at the close of whose testimony it was stipulated that the other members would testify substantially the same. The following extracts from Mrs. Edwards' testimony will sufficiently disclose the association's attitude and legal relations to the property and church society:

"I was a member of the club known as the 'Harmony Club.' I think the club was organized in 1891 or 1892, but I am pretty certain it was 1891. I was a member from the time it was organized. * * * They came to us with the proposition to take us in with them in the association. I don't know what you would call it. They wanted funds to pay the interest on these notes that they had given for this property at the foot of the hill, and it seems to me that they had no money to meet the claims, as I understood it then, and as I understand it now. The money to repair that house after the fire was money that was borrowed from Mrs. Fish (Mrs. Poisson), and she was to pay no rent until that $1,000 was reimbursed to her, and there was no rent coming in to pay the interest on these notes, and they had no way of reducing it without the rents, and they came to us with the proposition to come in with them and let us pay the claims of the property. At that time we had considerable money in the club fund. I think it was in the neighborhood of $700. * * * After we had agreed to the proposition, all money that came from the rental of the property and all the money that had been made from entertainments and monthly dues went into the treasury of the Harmony Club and were paid to the treasurer, Mrs. Dube, and that money was used to pay all claims against this property at the foot of the hill, to pay the interest on notes and taxes, and reduce the principal. At least that is how I understand

it. That has been done ever since we went into the club, since 1894. * * * The money that was realized out of those picnics and socials was turned into the same general fund as all the others, turned into the treasury of the Harmony Club and used for the same purpose, as far as I am aware. * * *.

"Q. As to the object for which this property was purchased?

"A. When it was bought first, I think the understanding was that the new church was to be put on there. The proposition was Father Manning's. The gentlemen backed him in it, but he thought it was a good proposition for the church, providing we bought Dick Lang's or this property; but at the same time he thought the property was worth the price that was paid for it at any time. * * *

"Q. Were you led to believe by the action of the men, Mr. Croze and Mr. Fox, that this property would be turned over to the church when they were requested to do so?

"A. I never had any conversation with them. I don't think they led me to believe it or not to believe it. I think the formal organization of the Harmony Club with a constitution and by-laws was in 1894, but we had a club in existence that was practically the same club, known as the 'No Name Club.' It was a ladies' society at first without any formal rules or specific objects. I think it had a constitution and by-laws. It was so organized that we had regular meetings and kept records of the club. I think that was true before 1893, but I couldn't swear. * * * That is a copy of the original constitution of the club under the name of 'No Name Club.' I think it was the No Name Club in 1891. I didn't think it was dated 1894. Later the name was changed to the 'Harmony Club.' I think there was no other change in the reorganization except the change of name. I think this is a copy of the original 'No Name' constitution."

Sections 2 and 5 of the constitution are as follows:

"SEC. 2. The object for which it is formed is the promotion of sociability; unity and thorough Christian charity among its members; friendship in assisting each other by every honorable means; unity in associating together for mutual support in sickness as well as enjoyment while in good health; true Catholic charity in doing to each other as we would have others do unto us.

"SEC. 5. In case of an appropriation of money for charitable, benevolent, fraternal or extraordinary purposes, other than for paying the common or running expenses of the club it shall be the duty of the member asking for such appropriation to notify the president and secretary at least fifteen days before the next regular meeting of her intention, and it shall be the duty of the president and secretary, either verbally or in writing, to notify, previous to the meeting, all members of the club in good standing that such demand will be made and to determine such appropriation, the concurrence of three-fourths of the valid votes cast shall be necessary. Whenever all these conditions are not strictly complied with, the president, secretary and treasurer are enjoined not to issue an order or to pay over the amount of the appropriation, and if they do so, it shall be at their own risk and peril."

Mrs. Edwards further testified:

"I think it was in 1894 that an arrangement was made by which the Harmony Club became interested in this property, and from that time the club paid certain moneys on account of the indebtedness on this property at various times, and continued to do so, as far as my knowledge goes, until last May, a year ago. The Harmony Club also spent money for other purposes, as I recall, twice. The first time as an appropriation to pay for the furnace that was put in the parsonage. I think it was $70. The second time was a check that was sent to Father Rezek when he was away and ill in the hospital; $100, if I am not mistaken. There was also an appropriation towards the purchase of a window. That was $500. Those moneys came out of this same fund. The by-laws, I think, provided for the authority. We discussed the question of paying for the furnace and voted upon it, and it was decided to pay it. It was a vote of the Harmony Club. The moneys belonged to the Harmony Club until they appropriated them to any different use we saw fit. I couldn't say if the St. Ignatius Church Society as a society would have no right to control those funds without the consent of the Harmony Club. We had never given them the right to control the funds, but the right was taken away. * * * In the organization of the club, no one but the members had authority to direct what to do with the money. * * * I don't think they had the right to appropriate money for any purpose the

club saw fit. It wasn't the intention of the club to work for any charitable purpose. * * *

" *Q.* At the time it was first arranged that the ladies should assist in raising funds and should apply those funds towards the expense of this building, it was understood to be the desire of the people interested that the building of the new church should be put there, was it not? * * *

"*A.* Yes, the new church was spoken of as being put there. I don't know if it was before the decision had been made by the church society as to the location of the church. I don't know when the decision was reached. Between Father Manning's time and down to the time that Father Rezek came, there had been no decision on the location of the church. That matter was decided after Father Rezek's incumbency, and the decision was that the church should be put where it stands today, in the neighborhood of its old location on the top of the hill. I don't remember when that action was taken by the church society. It was a formal action by vote of the parishioners. I think the trust deed to Mrs. Hennes was drawn up in March, 1895. That was before Father Rezek came here, and must have been before the location of the church was decided. The date of the trust deed to Mrs. Hennes was June 29, 1895. [Referring to paper.] Mrs. Hennes took that as trustee for the Harmony Club, and in no other capacity. I don't know that it was given to secure what we had paid out. I thought we were promised an undivided half interest in the property, and I supposed that was the reason that it was given. * * * There was a good deal of discussion in the Harmony Club as to the disposition of their funds, the eventual disposition of this property, during the past few years. There was no division among the majority of the club. We had the one purpose in view. There was perhaps one or two objected to its going to the church. They objected to Father Rezek handling it. Any other priest could handle it. We all expressed a preference for putting it in an altar, but the money would have been given to the priest and let him order the altar. There were a few that proposed that the money should be spent directly by the ladies; that they should determine what it should go into. For a long time it was a matter of discussion in the club. The final action as to the disposition of the interest of the club in the property was taken last fall, I think,

very recently. That was done by a vote of the club, to turn the property over to the bishop or the church society. Up to that time no determination had been come to permanently. That action was taken at a meeting of the club and was voted on. * * * That action of the club resulted in something of the nature of a quitclaim deed to Bishop Eis of our interest, whatever it would be, which was supposed to be, or which I supposed was an undivided half interest. That was the end of the connection of the Harmony Club with this property. Before that action was taken resulting in the conveyance to the bishop of the interest of the Harmony Club to the property, there had been for a long time a discussion among the members of the club as to what to do with it. Among other things discussed was whether we would sell our interest to Mr. Croze or to anybody who would buy it. The discussion went so far as to fix the price we would take for our interest, and that was with the idea of converting our interest into money and then using our money in such a way as we saw fit for some church purpose. * * * This deed or declaration of trust that was given to Mrs. Hennes as trustee was to give us a half interest by reason of the moneys we had paid and were paying. So far as the Harmony Club was concerned, that was all the interest we have had, and up to the time that interest was transferred to the bishop, it belonged to the Harmony Club as a club. I don't think that the public understood that the picnics and entertainments were for the Harmony Club. I don't think that most people that attended understood it that way. They thought we were working for a new church, and what money they gave went for a new church. I think the general public thought the proceeds went into the general fund of the church, because I don't think they discriminated or asked any questions what we did with the money, except we were working for a new church. We told people we were working for a new church. It was for that particular purpose, for a new church. After the site of the church had been decided upon, I am not aware that there was any change in the workings of our club, collecting the money and turning it over to the bank or to our treasurer. We gave socials and picnics in the same way after that as before. The intention of the club was not for any charitable purpose. The intention was for a new church from the very start. * * *

"*Q.* Will you state whether or not that constitution expressed the intention of the club, as written by Mr. Wieber ?

"*Mr. Rees:* Objected to as immaterial and as trying to vary the terms of a written instrument.

"*A.* No, it did not express the intention of the club. * * * It was Mr. Wieber's proposition to put the purposes of the club as it stands in that constitution that was shown to me. We had had trouble with the priest previous to this time. Some of the ladies of the church had got rather tired of working for a new church, as we had been doing, and then having the money going into the general fund of the church, and then being squandered, and we planned to put whatever money we raised into the bank and used as a nucleus for a new church. We had had one entertainment, and the priest had been to us and wanted to get the money from us, and we had some trouble over it, and we decided to form this No Name Club, and we raised money and deposited it in the bank to the credit of our treasurer, and Mr. Wieber put it in the form of a charitable organization or something of that kind, so that the priest or some other priest might not have any hold upon the money; but the object was understood by every one of us who helped to draw up those by-laws that the money was to go for a church fund. It doesn't state so in the by-laws. It states a benevolent or fraternal organization, but that was the object, a new church fund.

"The deed given by Mr. Croze to Mrs. Hennes was given to her with the understanding that it conveyed an undivided one-half of that property to the club in case the option was not taken up by the church, by the bishop. That is how I understood it. * * * We at one time tried to transfer our interest in this property to Mr. Croze. We offered it to him. We wanted him to buy it, or we wanted to sell to him, or that he sell to us. He made us an offer, I think, of $1,000 for our half interest, which we considered too small and wouldn't accept. I don't think we made him an offer for his portion of it. I don't recall it.

"The real intention of the formation of this club was that it was formally organized so that we could raise money and keep the control of the money ourselves. At least until such a time as we had a priest we could trust, or until such a time as we wanted to let it go. That is

just what we did; kept the funds or the property in our own hands until last fall, and under our own control. * * *"

Paper offered in evidence, marked "Exhibit F:"

"Mrs. ELIZABETH HENNES,
   "Trustee of Harmony Club.

"*Madam:* At a special meeting of the Harmony Club held October 12, 1904, called by order of the president, Mrs. Joe Haas, the following resolution was adopted: Resolved, that the Harmony Club interest in the property known as the Harmony Club property or Michigan House, situated at the corner of Shelden and Portage streets, be transferred to the St. Ignatius Church Society, and you are hereby authorized and empowered to make such transfer."

Signed, etc.

In pursuance of this resolution, Mrs. Hennes, on October 15, 1904, conveyed the undivided one-half interest held by the club in the property to the complainant, "for the sole and only use, benefit, and behoof of the St. Ignatius Church congregation," etc. During the same month the present suit was commenced.

Defendant Croze testified:

"With regard to the instrument of Mrs. Hennes, after consideration about this house and place—we were getting pretty fair rent—I went to the ladies, for I was one of the members of the club, and I made a proposition to them. They had some money, and if they would come in with us for the corner house, that for their money I would give them a deed for half the property. That proposition was accepted by the ladies, and the result of it was the execution of the instrument in evidence. There were no other transactions with reference to the property since then. Nothing in the way of deeds or papers besides that one. That was the final paper. * * *

"From the time that this property was purchased, up to the present time, I haven't put in anything but donations. The donations to the socials, and sometimes my tugs and scows; I would charge them half and sometimes not at all, and sometimes a little; but I never considered I would ask anything. I don't think any cash money has been paid by me in payment of the principal or interest on

any sum of money borrowed for that property. All the work that was done through my men on that property was paid to me by the Harmony Club. I rendered a bill, and they gave me a check."

Some time in 1902, and afterwards, demand was made of defendant Croze for a deed of the property by the parish priest, acting under power of attorney from complainant, coupled with an offer to pay all demands and charges against the property, in compliance with the declaration of trust. All of such demands were refused.

The bill of complaint was taken as confessed by all of the defendants except Joseph Croze, who alone appeals to this court from the decree granting the prayer of the bill. It is the contention of counsel for complainant that the Harmony Club was a church society organized for the benefit of St. Ignatius Church Society; that the moneys raised by the club constituted a trust fund for the use and benefit of St. Ignatius Church Society, and therefore belonged to and were subject to the control of complainant; that the moneys belonging to complainant for the use and benefit of St. Ignatius Church Society, and having been paid by the Harmony Club in the discharge of obligations created by the purchase of the property and covered by the declaration of trust, were payments "by or on behalf of the St. Ignatius Church Society," under the provisions of such declaration.

It is apparent, we think, from the record, that the men's committee purchased the property in question for the purpose of providing a site for the new church building, that they solicited the aid of the ladies' society for that purpose, and that the ladies so understood. It is also clear that the moneys accumulated by the No Name or Harmony Club were not accumulated for general church purposes, but were obtained either for the specific purpose of building a new church, or for such other specific church purpose as the club members should determine upon. The funds in the club treasury did not belong to the complainant, nor to the St. Ignatius Church Society,

nor were they subject to their control. The club members, who, by their energetic, unselfish, and intelligent efforts, had accumulated the fund, had a right to determine the church purpose for which it should be used. *Amish* v. *Gelhaus*, 71 Iowa, 170.

The club united with the defendants in purchasing the land in question for the purpose of providing a site for the new church, if the church society concluded to accept the offer. The purpose of the club members was the same as the purpose of the men's committee in making the original purchase, and they no more represented the complainant or the church society in their dealings with the property than did the men's committee. By the agreement of June 29, 1895, the club, through its trustee, Mrs. Hennes, became entitled "to an undivided one-half interest in and to" the real estate, subject to the terms and conditions of the declaration of trust. Some time after the club acquired written evidence of its interest in the lands, the church society determined to locate the new church upon the old site, and not to accept the lands in question for the purpose for which they had been purchased. This action of the church society was equivalent to notice to the trustee and the club that the society did not desire the property for the purpose for which it was acquired. The exact time of this action does not appear, but it must have been later than November, 1895, when Father Rezek became pastor. A few months later, the time expired within which, "but not thereafter, except at the option of said trustee and said indorsers, the said property is to be conveyed," etc. No steps were taken by the church society or complainant during the prescribed period, nor for six years thereafter, to comply with the provisions of the declaration of trust, or even to notify the trustee that they considered it in force, and the record discloses no waiver of his rights on the part of the trustee. The payments which were made by the club after the expiration of the three years were made in pursuance of their original understanding embodied in the written agreement that they were to have an undivided half interest in the property.

"The deed given by Mr. Croze to Mrs. Hennes was given to her with the understanding that it conveyed an undivided one-half of that property to the club in case the option was not taken by the church, by the bishop."

The church, or the bishop, did not take up the option, and the undivided one-half interest of the club in the real estate, representing its payments, has been conveyed to the complainant, which counsel for defendants concede he is entitled to hold.

The complainant can predicate no rights upon the action of the Harmony Club, so far as the performance of the trust conditions is concerned, and the failure of performance on his part deprives him of the right to call for performance on the part of the trustee. The testimony as to the purpose for which the property was purchased was objected to as tending to vary the terms of the declaration of trust. Without determining whether this objection is valid in a case like this, where complainant can only hold real estate "for charitable, religious, and literary purposes, or for burial grounds" (3 Comp. Laws § 8310; *Thompson* v. *West*, 59 Neb. 677 [49 L. R. A. 337]; *First M. E. Church of Chicago* v. *Dixon*, 178 Ill. 260), we are of the opinion that the evidence was competent for the purpose of determining the legal effect of the action of the Harmony Club.

The decree of the circuit court is reversed, and the bill of complaint dismissed, with costs of both courts to defendant Croze.

CARPENTER, GRANT, MONTGOMERY, and OSTRANDER, JJ., concurred.